20-1260 et al. Holy Cross Electric Association, Inc. doing business as Holy Cross Energy Petitioner versus Federal Energy Regulatory Commission. Mr. Elliott for the Petitioner. Mr. Glovert for the Respondent. Good morning, Council. Mr. Elliott, please proceed when you're ready. May it please the Court. Randolph Elliott on behalf of Holy Cross. FERC's orders have two flaws warranting vacatur and remand. First, FERC misinterprets the party's agreements. Second, FERC fails to explain why it has not sanctioned undue discrimination. These issues overlap, but I want to begin by briefly addressing the second one because I think it will help understand our contractual interpretation arguments as well. Under the Transmission Integration and Equalization Agreement, Public Service Company and Holy Cross agreed to the joint use on equal terms and the operation of their transmission facilities as an integrated transmission system with no adverse distinction between the two parties. FERC held, however, that because Public Service also uses Holy Cross's entire load ratio share of the integrated transmission system to provide full requirements service to Holy Cross. Because of that, all of the load ratio share capacity is used up and Holy Cross is not entitled to use any of the ITS for any other resources, including the two that are at issue here. But FERC did not explain how that interpretation comports with the agreement's requirement that the parties have access to the ITS on equal terms and that there be no adverse distinction between the parties. Because the question here comes down to the fact that Public Service also uses this agreement and the Integrated Transmission Service to serve its retail loads. Public Service does not use its OATT for retail service under Order 888. It never has. But FERC's orders made no... Mr. Elliott, I'm sorry to interrupt you, but as I read, if the only thing before us was the power supply agreement and the operating agreement, FERC would be clearly correct, right? If those were the only two... No. I mean, the power supply agreement quite clearly says that economy power is not term power, right? The power supply agreement does not say that, no. Section 1.11... It doesn't say the power supply agreement doesn't allow interruption of economy energy, for example? It does not say that. It doesn't say that? No. No, it doesn't. That's one of our key points is that both the definition of economy energy in Section 1.11, that's at Joint Appendix 54, I believe, and Section 5.4, the discussion of economy energy, neither one of them say that all economy energy is non-firm energy by definition. It's simply not defined that way. Is it not true that they can interrupt economy energy if they're required to take a generator offline? That provision is in there, but that's simply to preserve the economic bargain that economy energy will not increase... I do not understand what you just said. I mean, it's in there, right? If it's part of the bargain, it's part of the bargain. They can interrupt Holy Cross's economy energy if it would require taking a generator offline, right? That is true. If we were only talking about power supply, that would be true. Yeah, okay. We go back to my original question. If all we had was a power supply agreement, FERC would be right, correct? Your argument, as I understand it, the key is the transmission agreement, correct? That's your whole argument. The transition agreement, which entitles you to FERC, but I have to say I've read your brief, and you focus on section 4.2, but could you just explain to us exactly how 4.2 gives Holy Cross the right to firm service on economy energy? Just explain that to us. This is part of my argument about comparability. No, no, no, no, no. Please talk about section 4.2. 4.2 provides that- This entitles Holy Cross to low ratio shared use of the capacity of the integrated system. Explain to me how that gives... You may be right, but just please explain to me how that gives... Two questions. One, how does that give Holy Cross the right to firm service on economy energy? Number two, just one question at a time. Why don't you answer that question? It provides... 4.2 provides for the two parties to have equal access, equal use, that's actually the title of section 4.2, equal use to the integrated transmission system. Our position is that public service company does exactly what they are prohibiting Holy Cross from doing. They have more resources. Yes, but it's also the contract interpretation issue. And that's the problem that low ratio share... What exactly are they doing that you can't tell me? Yeah, low ratio share under the tie agreement should not be defined by reference to the resources used to serve Holy Cross under the power supply agreement. That nexus between the agreements is the linchpin of FERC's order here, and that is what is incorrect. Public service company, and we provided the only evidence in the form of an affidavit in this case, public service company has far more resources with firm curtailment priority than their low ratio share. So why can't Holy Cross do the same thing? FERC never addresses that issue. That's our discrimination comparability issue, but it's also the linchpin of our contractual issue, a problem with FERC's orders, that the two agreements, they've mixed apples and oranges, as we said in our reply brief, and that's exactly the description. Holy Cross, I mean, sorry, public service company has lots of resources, including wind and solar resources that have firm curtailment priority. They're not limited in the number of resources they acquire by their low ratio share, and that seems to be undisputed fact in the case. So why is Holy Cross's low ratio share capped at the level of resources used by public service company under the full requirements contract of the power supply agreement? There's just no logical connection. This is arbitrary and capricious because there's no connection between the facts found and the choice made. Just one more quick question. FERC says in its order here, paragraph nine of the first order, it says that PS Colorado says that if it has to provide firm transmission service on economy power, Holy Cross could gain the charges under the supply agreement. And it says, and shift to other customers, I'm reading from the order, and shift to other customers, the transmission costs associated with the transmission upgrades needed to firm up. As I understand it, what they're saying is that if Holy Cross is allowed, if Holy Cross is entitled to firm service on for economy energy, it won't have to pay the capacity charge. Is that right? Well, it does not pay a capacity. It continues to pay capacity charges under the public, under the power supply agreement for this economy energy. So Holy Cross is, I'm sorry, public service is not out a nickel of capacity. So Holy Cross does continue to pay the capacity charge for economy service? Yes. Yes. That's what 5.4, that's what 5.4 says. And Holy Cross is completely on board with that. They're only public service can gain the charges under the supply agreement. What does that mean? I think they're saying that public service did not contemplate that there could be firm energy with firm curtailment that could be used to displace the energy charges. But the agreement provides that. It doesn't, as we already talked about, it doesn't limit economy energy to non-firm energy. So Holy Cross bargained for that provision. It's not gaining it. So the only advantage Holy Cross gets under this is that they get firm energy. And firm, I don't mean 24-7 because this is wind and solar resources, what we're talking about, but they just get the right to have it delivered when it's available from the wind and solar resources to their load. Can I ask one question about the operating agreement and then and let's just assume that the operating agreement applies. I just want to look at the language of it with you. In paragraph 3.5, there's a sentence that is at issue in the briefing where the parties recognize it may be necessary to curtail economy energy schedules due to emergency operating conditions, including transmissions constraints, or when continued scheduling of economy energy would prevent firm power transactions. And if you just read that it's hard for me to come away with any conclusion other than that economy energy doesn't have to be at firm power because this clause specifically contemplates by terms when continued scheduling of economy energy would prevent firm power. So it just seems to me that if we only look at this clause, it presupposes that economy energy is not necessarily at firm power. I think this section is agnostic on whether it's firm or non-firm. It accommodates either. If it is non-firm, it should be curtailed, but the language there is it just says the parties recognize that it may be necessary to curtail. That's true, so it may or it may not. If that were firm power, it wouldn't be true. You just never need to curtail it. You can't curtail firm power. So the fact that this says may suggests that it's not firm. It suggests that not all economy energy is, I would agree with you, not all economy energy is firm. But Burke's position here is that all economy energy is not firm. I don't think so. I think, I mean, we'll hear from the commission, but as I understand it, the commission's position doesn't have to be that economy energy is never firm. It's just that economy energy doesn't have to be firm. And once that's the case, I think that answers the question that was presented to the commission in the declaratory, the request for a declaratory, is it declaratory relief, declaratory judgment, whatever the commission's terminology is. But I thought that's the question before it is, does economy energy have to be a firm? Yeah. My interpretation of the order, I mean, footnote 59, I believe the declaratory order says they're making no findings whether the wind and solar resources here are firm or non-firm. Their holding, their interpretation doesn't depend on that. And Burke's brief, I think, says that any resource, firm or non-firm, I mean, any resource, any economy energy resource must be non-firm. That's Burke's position on brief. And that's the way I interpreted their orders. Unless my colleagues have further questions for you, you've teed up nicely what your argument is as to what the commission intended. Why don't we hear from commission's counsel? But let me make sure that I don't, that neither of my colleagues have additional questions for you at this time. No, I don't. Thank you, Mr. Elliott. Mr. Glover, we'll hear from you. Thank you, Chief Judge. May it please the court, I'm Matthew Glover and I represent respondent, Federal Energy Regulatory Commission. If it's all right with the court, I'll start with what you were just discussing as to Chief Judge Srinivasan. I think you're accurately describing the commission's position. We did not mean in our brief to suggest anything contrary. And I think you did say footnote 53 in the declaratory order where the commission explained that it didn't need to make a factual finding regarding the firmness of the purchases from the Hunter and Ariba projects that are issued here. Because it's finding based on the terms of the agreement that have already been discussed, including the power supply agreement, section 5.4, the operating agreement, section 3.5, that the transmission of any economy energy may be curtailed for, and you highlighted both the reasons suggesting that it's non-firm, for firm power transactions that's in the operating agreement. And in both the operating agreement and the power supply agreement, it discussed curtailing it if it were required taking a generating unit offline. Not to get too technical, but as Judge Tatel stated, firm power and firm transmission is service that can't be interrupted except for a reliability or emergency concern like constraints on the system. And if you're curtailing power under either the power supply agreement or the operating agreement, because it would require taking a generating unit offline, that's a cost concern that public service would have, you know, wasn't enough demand that they have to take a generating unit fully offline, there's a lot of cost to doing that. And so they're allowed to curtail economy. Oh, Judge Tatel, I think I see you asking a question, but I can't hear. No, no, no. Oh, my apologies, Your Honor. I'm sorry. No, no, my apologies. So if you're curtailing economy energy because otherwise you would be taking a generating unit offline, that's not a capacity constraint. That's not an other constraint. That sounds, that may be right. And I guess intuitively it sounds potentially right. But how do we know that we can close the loop by saying that taking a generating unit offline is not an emergency? Because a contrary position could be, well, yeah, firm, even firm power, even firm transmission service can be curtailed in the event of an emergency. And taking a generating unit offline is an emergency. Now, I know that you think it's not, and it's intuitively seems like it probably wouldn't be, but where would I look to make that it's not? I guess, so I would have two points. You're correct that that's not something that we dwelled on or the parties particularly dwelled on in our orders or in their filings. I guess my point was going to be, and you're absolutely correct, there could be capacity emergency constraints for which you would need to take a generating unit on or offline. But the fact that they could say, gee, unless we supply you from this unit, if you use economy energy, we're not going to have anyone purchasing from this generating unit. So we would need to this unit online because there's costs associated with turning a unit off and on. And again, I meant to highlight that as a curtailment ability that's in both the power supply agreement and the operating agreement. The clearest, plainest statement that whatever the status of the supply is, the transmission for an economy energy purchase will not be firm or highest priority transmission is the statement that I believe both Judge Tatel and Chief Judge highlighted in the operating agreement that you could curtail an economy energy purchase if it would provide for a firm transaction. Paragraph 3.5 of the operating agreement. Absolutely, Your Honor. Go ahead, finish the thought and then I have one follow-up. No, I was just going to close the loop that the commission said. I think it's paragraph 17 of the reply brief and it's set up a number of places. You can't be that highest priority firm transmission if you could be curtailed for some other firm transmission, that means you're not highest priority. Right, and 3.5 presupposes that economy energy at least doesn't have to be at firm. And once we know that economy energy doesn't have to be at firm, then the commission's answer to the declaratory relief that it was asked about is, in your view, something that should be sustained. And I guess as I understand the challenger's argument, it goes something like this. I don't think they would accept the premise, by the way, but I'm going to stipulate that the premise should be accepted for the purposes of the question that I'm asking, which is that, sure, maybe 3.5 might be seen to say that economy energy doesn't have to be at firm. But there's still this other problem, and that's this comparability notion that under this comparability notion that's embedded in the agreements, there has to be an equivalent transmission for both what public service company does on its own right and for what Holy Cross would do. And public service has wind transmission that it treats at firm from Rush Creek. I can't remember the exact name. And by virtue of the comparability component of the agreements, Holy Cross's similar power has to be treated in the same fashion, which is at firm level. And as I understand the commission's response to that, it was no, that can't be right because public service company is required to at least be prepared to provide all of Holy Cross's demands at firm, and therefore anything in excess of that that it gets from a third party can't be at firm. Now, if I disagree with that part of the commission's rationale, and I'll just say the reason I might disagree with it is that the contract speaks in terms of the substitute power being the third party power being in lieu of rather than in addition to, and which makes it seem like it's a substitute rather than an add-on. So if I thought there was some problem with the commission's rationale on that score, where does that leave me? So I think I would have two responses. And the first, I want to directly address your contention about in lieu of. And then second, I'll point the court to the hearing order, excuse me, at 24, which discusses the comparability. And there's a sort of separate point I'll make. But let me start with where you just finished, if I might. The point is that even if you purchase economy energy in lieu of supply from public service, public service has to stand ready. And so it needs to hold transmission capacity. Public service couldn't give away firm commitments or firm reservations for all of its transmitting lines, including when there's economy energy, because in the event the economy energy isn't supplied or isn't curtailed, public service needs to constantly, as it plans the transmission system, be making reservations for firm supply from its own resources. And it needs to hold back its own generating resources because it can be called upon at any time to supply the full requirements demands. In other words, so if Holy Cross decided, for example, to discontinue the third party economy energy, then it has to be able to draw upon the reservation from public service company right away. And yeah, and the reservation of both of its own generating capacity and of space on to get from its generation to the end points of public service. And this gets a little bit into some peculiarities of the power supply agreement as compared to the operating agreement. The operating agreement doesn't supply provisions to designate network resources and a lot of other things that you would see in an open access transmission tariff. The power supply agreement does have the designation of the Western Power Preference locations and the points of receipt and points of delivery. And so the power supply agreement has a lot of these provisions that you would normally see in a transmission open access. So that's my first point, that they're always having to hold that capacity on the transmission system and of their own generation as well. I'm sorry, but is that your answer to Chief Judge Srinivasan's question about its own wind and solar power? Is that the answer to the discrimination issue? Because PS company doesn't have to do that with respect to its own? As to the discrimination question, let me... Sorry. Yeah, no, go ahead. I just didn't understand why what you... I understand what you just said. Okay. PS company's obligation to provide full service to Holy Cross, but I didn't understand that to be an answer to Chief Judge Srinivasan's question. My apologies. I think, again, on the anti-discrimination, the more direct answer is in paragraph 24 of the rehearing order. And I'll move there. Sorry, Judge Cheadle, I think I interrupted you. No, no. I just said, okay, what's that? Yes. In paragraph 24 of the rehearing order, the commission explains that the reason the comparability argument doesn't have merit is because public service is at all times treating Holy Cross's loads. When it does this planning, when it sets aside its own generation, when it sets aside transmission capacity, both at generation from transmission for Holy Cross, it's treating Holy Cross's entire requirements demands, which it could be called upon to serve as equivalent to its native load or the same as its own retail customers. And so it's always treating its possible required demands to serve all of Holy Cross's loads, the same as it's treating its own retail loads, just as it was making firm reservations, et cetera, for its retail loads. It's standing ready to provide for Holy Cross anything Holy Cross needs. So I think it was the Rush Creek project is the one that Judge Srinivasan questioned. At all times, public service is keeping capacity at generating units, including that one, and firm transmission space to provide both to its own retail customers and to provide to native load. I realized that it's a little bit technical, but as equivalent to its retail customers. When public service is using Holy Cross's load ratio share of the capacity of generation and transmission to plan for providing to public service, it's treating that load ratio share the same as it treats its own retail customers. You have to go back and answer. You said you were going to, and you haven't really. I'm curious to hear what you have to in lieu of, in addition to, and you saw, I want to address that. How are you weighing those concepts and where are you applying them? I want to make sure I have this picture straight. In lieu of, in addition to, what do you mean by that? So when the commission, I think he was referencing in lieu of, in the ability to purchase economy energy in lieu of purchasing full requirements. Right. And so that tells you that you're purchasing economy energy rather than using the full requirements of Holy Cross, but Holy Cross has to stand ready to provide, you know, in place of that economy energy. So the public service company has to stand ready. I'm sorry. Yes. Thank you. My apologies. And I know I'm in the red light, but I'll continue answering your question. In addition to is what I'm really a little bit perplexed on. I want to make sure I understand what you're saying. I understood the in lieu of, and they've got to be to satisfy the full requirements, right? And that could include the economy energy, right? So they have to stand ready to replace the economy energy at all times. Right. So I think I hate to kind of use a numeric example, but for the commission statement that the transmission provide, if you gave firm transmission for an economy energy purchase, it would be in addition to the load ratio share. The load ratio share is as defined in section 1.9 and 6 of the transmission agreement, the proportion of the total transmission integrated system that Holy Cross's demands are making at peak demands over a 12 month thing. I don't mean to get into the math, but if you did that math and you had some number 10 is what Holy Cross's load ratio is a percentage, you know, 10% at all times, public service needs to plan its generation and it's the integrated transmission system so that it could provide the full, you know, 10% or the full, whatever the actual amount of power in kilowatt hours would be. It has to always stand ready to provide that. So even if you purchase economy energy in lieu of purchasing from public service, public service has to make those advanced reservations. It has to hold capacity of its own generation and of the transmission system for Holy Cross's load. And so if you give them firm for the 10, they would need 10 and public service is holding 10 out there, but then they want to replace one with economy energy. Public service still has to at all times hold that 10 in its generation and in transmission in the event economy energy were curtailed. And so that's where the in addition to would be that one or two that they'd be asking to displace might mean that you're not actually supplying that generation and you're not actually using that capacity on the transmission system, but they're holding it in reserve. They're holding it ready. They're holding firm reservations to do that if they need to. Can I, you just, I was going to ask you about this in excess language too, and I want to be sure I understand it. So if let's stick with your 10% limit, suppose, suppose, suppose, suppose Holy Cross's load ratio shares 10% of the system, right? That means it's, it's native load is to serve its native load. It's using 10% of the integrated system, right? Yes. Okay. Now let's assume that it gets half that energy fibers, half that energy from from one of these other sources, economy energy. How will that, why would that put an obligate? Why would that be an excess? Wouldn't that just replace power that it's now getting from PS company? It's because PS company still has to, under the power supply agreement, at all times be ready to replace economy energy, right? It has to make its reservations. If you imagine a scenario. So let me see if I can say it. So, so in other words, it has to stand ready at all times to provide firm service for, if public service, we're getting all of its power from PS company, I'm sorry, if Holy Cross, we're getting a hundred percent of its power from PS company, PS company would have to provide all on a firm basis, right? Well, yes. Sorry. Sorry. I don't mean to get too picky. Your honor, the contract specify that it needs to be on the same service level as PS co's retail load. And there's no dispute as a factual matter that PS co's retail load is given firm service. So yes. Okay. So, so all right. Let's just assume, right. That's right. It has to provide. Now let's assume that, that they now take only half their power from PS company. Okay. Explain to me why they're still getting the same amount of, the same amount of power is still flowing over the system that hasn't changed. They just replaced PS company power with, with economy power. And they're permissibly doing that. Which is permissible. Right. So how does that, how does that, if, if, if PS company has to provide firm service for the 50% power, why does that, why is that in excess of a low ratio share? Right. I just don't understand. Sorry, your honor. So in your example, right. I think we agree that when they're getting the full 10% from PS co PS co is placing reservations on its generation. Excuse me. It's generation resources for that 10% load. And it's placing reservations on the transmission system for that 10% load. When purchases from PS co are displaced or in lieu of with purchases of economy energy, the contracts require PS co to stand ready to at all times serve the entire requirements demand. So it's a planning factor that PS co is planning the transmission system and it's planning its generation resources to always be supplying that 10% with firm transmission and firm generation resources. So it's always holding reservations for that full 10%. Even when they're supplying it, they're, they're, they're in ready. That's different. See the question conceptually is they have an obligation, whatever number we're using the 10% with, they have an obligation. You're starting with a hundred percent on the, the basic contract. You, the requirements contract, you have to give us a hundred percent if we want, but we can display. So we can, we can take say 10% of that and get it from alternative sources, right? You're arguing that, but that 10%, we still have to be ready to supply. The question they're raising is, well, wait, how does the 10% that we are permissibly going to get from an alternative source? How's that go to a lesser status than it would be if you supplied it? Yeah. And in response to that question, I would start by saying the operating agreements, plain text says that economy energy may be curtailed. And so the operating agreement, sorry. Well, but excuse me, but their whole argument is that the transmission agreement. Right. And there's nothing in the FERC opinion that responds to that. And that's why I was trying to understand from council of Holy Cross exactly why they thought the transmission agreement changed, but that's their only argument. He, I think he conceded when I asked him the question, that if you're just looking at the power supply agreement, that, that, that economy, power may be interrupted. I think he agreed with that. It's all about from their point of view, it's all about the transmission agreement. So Judge Tatel, I would make two responses. One, I respectfully would disagree that the commission didn't respond to that. The commission stated that the transmission agreement alone doesn't answer the question. The question posed is, is Holy Cross entitled to firm transmission service for the Ariba and Hunter purchases? And so the commission's answer was, we, we don't see the transmission agreement answering that question. And, and so that it would include their suggestion that the transmission agreement somehow supersedes these specific provisions of the power supply agreement and the operating agreement. And I think, I think I've, what about their argument about section 4.2 of the gives them the right to firm power, firm service. 4.2 gives them the right. I guess this goes, and I suppose it sounds like I haven't been explaining our position on the non-discrimination and the native load, but our position is again, even if they're not purchasing the power from public service, because they're using economy energy in place of public service, public service has to reserve in its own generation and reserve in the transmission system to provide the full, I think the number we've been using is 10%. Can I ask the question, the question, the following way, your argument on this issue is if we take the example that we've been using, let's say the number is at 10%. And let's say half of that is coming from economy energy. So that would be five, five of the 10. Your argument is yes, it's true that Holy Cross can permissibly take the five from a third party as economy energy, but nonetheless, public service companies still has to reserve the full 10. So if you give the five at firm that they're getting from a third party, then that takes the 10 and makes it a 15. That's basically your argument. And I guess the, the way, the way I want to ask the question is this, suppose that I think that under the contracts taken as a whole, particularly 3.5 of the operating agreement, plus the provision in the power supply agreement that Judge Tatel has been focusing on, those are best read to contemplate that economy energy is not always provided at firm priority. Those provisions indicate that. And then Holy Cross comes along and says, okay, maybe those provisions might be seen to say that, but then we've got this other provision 4.2 that counters that. And it says, wait a minute under 4.2, it has to be equivalent and there can't be discrimination. And under that provision, we're entitled to get firm priority for our economy energy. And what I'm asking is this, this debate that we've just been having about exactly how to construe that part of the contract 4.2 and the comparability provision slash discrimination. If I think that's at least unclear, it's ambiguous. Then can I say that, well, the other provisions seem quite clearly to say that firm, that economy energy doesn't have to be supplied at firm priority. And then the second argument that Holy Cross has about how you do 4.2 is at least a jump ball. I don't know what to exactly what to do with that, but I thought what the firm, what the commission did was at least, you know, seems reasonable, even if I wouldn't have done it in the first instance, then can I sustain the commission's order on that rationale? Absolutely. Sorry, I think I cut off the last part of your question. I apologize. And are you making that argument that we can do it that way? Yes, absolutely. Can your honor. And I appreciate the question because I didn't anticipate sort of getting into the standard of review or the issue of Chevron deference, but they raised it in the reply brief at 28 to 30. And they point to this next era case versus Blythe where the commission said contracts were clear. And the court said, actually, we think there's the ambiguity there. The commission never said that the transmission agreement was clear on this, if anything, you know, as to 4.2, as to the entirety of the transmission agreement, the commission said that it didn't provide an answer. And we cite magic words cases in our brief. But I think you could also go to Black's Law Dictionary for the definition of ambiguous, including doubtfulness for uncertainty of meaning. As to the question asked of the commission in the declaratory order, is public service required to provide firm transmission for these transactions? The if found the transmission agreement was unclear that I would suggest that says it provided a doubtful or uncertain answer, which is to say it's ambiguous. And this court has a case called and I apologize, again, I didn't think the standard of review would be an issue. So we didn't cite this in our brief, but it's Braintree electric light department versus FERC 667 F third 1284. There's a passage from 1288 to 89. It's a 2012 opinion that discusses whether you could apply Chevron in an instance where the commission didn't say the contracts were ambiguous. And the court says that there's no reason to assume that the commission sees clarity where we do not. And that actually the preceding sentence is what I should have read to you first. As long as the text is ambiguous, and the agency does not insist that it is clear, a reasonable interpretation will warrant our deference. And then the following sentence is there's no reason for us to assume the commission sees clarity where we do not. The commission didn't say the transmission agreement is, you know, absolutely clear as to this question. It said the transmission agreement didn't answer this question. And it gave meaning to the provisions of all three of the agreements as to what they apply. So I think that would be my direct answer to your question, Your Honor, that both here on appeal, when we ask for deference to our interpretation, and in the orders when the commission is describing the transmission agreement is not answering the question, yes, you know, the commission was not finding 4.2 or any other provision in the transmission agreement to be clearly on point and dispositive of the question presented to it. Let me ask one other thing, which would surprise me that which means I didn't prepare it well enough. The chief ass. And I'm sure it's probably right. But is is the commission playing out his analysis that five becomes 15? That's what the in addition to means. And the reason is that because I wasn't hearing you to say it that way, because conceptually, that makes a great difference. I mean, you were continuing to say they have to make it available. In my mind, that means nothing more than they have that obligation to hold it available. If it's if it's called on it didn't to me convert to five becomes 15. Because it wasn't being necessarily being transmitted. The five unused by the by the PC PS is is available, but not used. So it's still 10. In my mind, but analytically, what the chief is saying you're saying is what the commission needs to say. So I think 15 apologies, if I can use the math example, and I clearly haven't been particularly clear. Again, if they replace the five that they would get, you know, they would still be used, they would still in real time have 10 moving across the system, which is why their load ratio share. But if you look at the reservations for firm transmission, PS co has to hold reservations for the full 10. So that they give the extra five, although they're not using that five, you're still reserving that to provide firm transmission. That's what the commission is transmitting that extra five. No, but you you couldn't give someone else a firm reservation for that. No, no, no, no, no, that I understand. But you're not necessarily using that five in real transmission terms. That's why five becomes 15 is odd to me. If you're not using it, you're transmitting. Well, it's because the transmission system, you take firm reservation. So at all times, not every firm reservation is being used in full. And so in a situation in which someone else came forward and said, we want the entirety of the rest of the transmission system. And we would like firm purchases for that public service would have to say, No, we can't give you that because we have to hold this full 10 for for Holy Cross. I wasn't seeing that way that you know, our brilliant chief judge, who likes to play in these arenas with math and all, you know, throws out the exam. I wasn't hearing it that way that analytically that makes some difference for me. Yeah, I apologize. Sure. I think that's probably my lack of clarity and explain my lack of capacity reservations as compared to necessarily use. And just to make sure I haven't let me be sure. I just want to pursue this because I'm as I've been as befuddled as on this question. So let's take our five hypothetical if, if, let's assume Holy Cross replaces 5% with economy energy, and no one else wants that, then, then there's no problem. There's no excess, right? Because, because public service company is still is still committed to no more than Holy Cross is low, correct? The problem is when someone else wants, right? Yes, Your Honor. And that's where this comes up. And that's, that's what increases. That's what that's where the in excess language comes in. Right? Yes, Your Honor. But the, and again, for firm transmission, that's why you have a firm reservation is for those times when everything subscribes. I get it. Second question. Your answer to the chief judge's question about discrimination is that there is no discrimination because PS company is obligated on the agreement to meet the loads of both Holy Cross and its own, and it does that equally. Is that right? Yeah, it's obligated under the agreements to meet the loads of Holy Cross in the same way that it meets its own retail load. Yeah, it's its own retail. And what about their argument that it provides its firm service on its own renewable energy sources? So that gets into, I guess, that gets a little bit far afield from whether they're supplying the equivalent retail. But that's their, that's their argument. That's the argument Holy Cross makes. And so the commission's response, again, in the rehearing order at 24 was that we are treating them the same as we're treating their retail load. And this gets into, I guess, some technical aspects about designating network resources and things that the operating agreement doesn't address. But there's the commission's position was that Holy Cross, when it supplies to public service, it supplies public service, the same service transmission and generation. Sorry. Yes, absolutely. I apologize, Your Honor. When public service is supplying to Holy Cross, it's supplying to Holy Cross identically to how it supplies to its retail load. So if Holy Cross is asking, is getting power from, and now I've completely forgotten the resource that the chief judge cited, but from that resource, they're getting it exactly identically to how public services retail customers would get it. And so, and that the operating agreement and the power supply agreement don't contemplate an open access tariff arrangement where a party comes forward and they designate their own network resources and they do all of these other things. The operating agreement doesn't have provisions for that sort of designation. And the power is called upon on the same plane that it provides its own retail load. Okay. I have just one last question. My very first question to counsel for Holy Cross was to ask him what he thought the first decision when it said that if Holy Cross is entitled to firm service on economy energy, it can quote gain the system. What does that mean? So I believe you were quoting from paragraph nine of the declaratory order and that paragraph is, so as the court's well aware, the commission stylistically in its orders describes the various arguments made by the parties. And that's a paragraph in the background section. No, I know that. I know that, but I'm just asking what public service meant. Yeah. Sorry. That was my very slow way of saying, here's what public, what I understand public service to mean, not what the commission means. Public service is meaning that the agreements only contemplate economy energy, the capital E economy energy being non-firm. And so if you can use firm energy and firm transmission for economy energy, you're gaming the system because when we made an agreement to provide you full requirements, we made an agreement that we would provide you full requirements except for certain designated resources, or you could replace us with economy energy. But we, we meaning public service understood that to only allow you to replace them with non-firm energy. And that's where I think it may have been you, your honor. It may have been the chief or judge Edwards that pointed out that the Holy cross had a footnote or sorry, not Holy. The commission has a footnote where we say we didn't, and I think it's 53, but I've sort of lost in my notes at this point. And we didn't take a position on the firmness or non-firmness of the supply. We understood that there's only one term or one sort of type of capital E economy energy contemplated by the power supply agreement and the operating agreement. And so whether the supply is firm or not, like we weren't passing on this sort of gaming the system with firm or non-firm supply. We were making the determination that no matter what the supply arrangement is, we don't need to know because we know that economy energy can be displaced because of, to allow for a firm power transaction or to avoid taking generating and offline. There's a few other examples, but again, I'm far afield. I hope that answers your question, but I'm happy to sort of discuss paragraph nine additionally. No, that's, I guess that's enough. Thanks. Yeah. Okay. Let me make sure my colleagues don't have additional questions for you, Mr. Thank you. We'll hear from a Holy cross council. Mr. Ali, we'll give you, we'll give you three minutes since we went substantially over time with Mr. Glover. I appreciate that. Let me begin with the last discussion because I, the way I interpret that, and it is good. No 53. I said 59 in my, in my opening argument, but Mr. Glover is correct. For instance, we don't need to look at whether these particular resources are economic or firm or non-firm because in the, in the reason is all economy energy is treated as non-firm. So I'm confused by that's the chief judge's earlier in the response was, isn't, isn't just finding that not as I understood your question position was didn't just find that it's not required to treat economy energy as firm. And, and I think the, as I read paragraph 21 of the rehearing order they're holding is public service is not obligated to treat economy energy. And it's a small E purchases as firm energy entitled to the highest priority. So I think they're making a blanket finding that anything that qualifies as economy energy under the power supply agreement is necessarily non-firm. And that's the point that we've is agnostic about silent on, and that's why they have to resort to the operating agreement, which Well, you just quoted, and I think this is at page 433 of the joint appendix in paragraph 21 of the rehearing order, it closes by saying, and public service company is not obligated to treat economy energy as firm energy. That's, I think what I was trying to say is that what it's saying is it's not obligated. That doesn't mean that necessarily mean, at least that all economy energy is never at firm. It's just that public service company is not obligated. I interpreted the order to mean that they don't need to look at the particular request that Holy Cross has made here because it doesn't qualify. It doesn't matter. It's, it's automatically non-firm. So no economy energy can be firm as far as holding, I believe. So, and therefore we don't even need to look at your, the particularities of your resource here. It plunks no matter what. And to get that, we focused on the operating agreement, section 3.5, and the operating agreement by its terms is just procedures. That's the purpose of it. It says in section 1.2, section 3.5 just says it may be necessary, but it doesn't say it's always necessary to confirm. But FERC's interpretation is that all economy energy purchases under the PSA are non-firm. And then they set on 3.5 here. This is an unfiled agreement, never filed at FERC. They use that to interpret the power supply agreement to then interpret the transmission agreement. I mean, this does sound like hiding an elephant in a mouse hole to me, to look to this unfiled procedural agreement, which doesn't say these are scheduling restrictions. It just says, these are the procedures we will follow where they apply. It doesn't purport to define scheduling priorities. It only primarily procedures to apply to scheduling priorities that exist outside the operating agreement. So FERC has used a complete bootstrap argument here. The comparability argument, if I could just very quickly, Mr. Glover focused on what I think is paragraph 25, actually, of the of the hearing order. Paragraph 24 says, we don't even need to look at your anti-discrimination arguments because this isn't a tariff, which is a ridiculous argument. But paragraph 5 says it's necessarily comparable because we're providing full requirement service to Holy Cross. And that is, by definition, the same as retail service. That's still, and that's what they say, and we've talked about the 5% and the 10% and all that, that still begs the question of how does public service operate with respect to resources like this when serving its retail load? We provided an affidavit saying they do exactly what we'd like to do. They treat it as firm. And it's not capped at their load ratio share. They provided no evidence. FERC cites no evidence. And so we think this is a complete, it begs the question, the statement that necessarily we win, and it has to be comparable by definition. That's not a recent decision making. We've talked about complex facts here today that are nowhere discussed in the order. Since therefore, we believe this matter has to, at a minimum, be remanded and the order vacated for want of recent decision making and the lack of substantial evidence. Okay. Let me make sure my colleagues don't have final questions for you, Mr. Elliott. Nope. Thank you. Thank you for your argument. Thank you to both counsel for your argument. Thank you. Thank you very much. We'll take this case under submission and the court will take a short recess to make sure that we're situated and closed for purposes of the third case. Thank you, counsel. This honorable court will now take a break for recess.
judges: Srinivasan, Tatel, Edwards